United States of America
District of Massachusetts

Suffolk, ss.

| | |
|---|---|
| Stephanie Rauseo and the | ) |
| Apple Hill Neighbors Group | ) |
| | ) |
| v. | ) |
| | ) |
| U.S. Army Corp of Engineers, Colonel | ) |
| Christopher Barron in his capacity as District | ) |
| Engineer, the Environmental Protection | ) |
| Agency, and the Massachusetts Department | ) |
| of Environmental Protection, and Marco | ) |
| Tammaro | ) |

## Complaint

Now comes the Plaintiffs, Stephanie Rauseo and the Apple Hill Neighbors Group, who repair to this Honorable Court seeking relief for certain environmental issues relating to a proposed two-house development at 15 Apple Hill Lane in Lynnfield, MA on the site of the former Sausele property.

### Plaintiffs

1. Mrs. Stephanie Rauseo has lived in the Apple Hill neighborhood of Lynnfield since the mid-1960's where she and her late husband move to raise their children. Her property on the corner of Russet Lane and Apple Hill Lane is within 300 feet of the proposed development. She is an abutter or affected party within the meaning of Massachusetts state law.

2. The Apple Hill Neighbors Group is an unincorporated group of politically-active citizens, primarily neighbors and abutters of the proposed development. Its membership is approximately 30 people strong. It maintains a mailing list. It has intervened in local permitting proceedings in opposition to the development. Among its members are Mrs. Rauseo, Susan Martin, Michael Walsh, Jane McDuffee and others.

**Defendants**

3. The U.S. Army Corps of Engineers ("ACE" or Engineers) is a branch of the Army which is specially granted authority to operate domestically on a peace-time basis. The Engineers have held primary regulatory and permitting authority over water of the United States for more than a century following the Harbors Act. Following the Clean Water Act and numerous other environmental reforms in the 1970's the Engineers now share that authority with the Environmental Protection Agency ("EPA"). The Engineers and EPA have executed a memorandum delineating and expositing their shared authority under the Clean Water Act for the waters of the United States.

4. Colonel Christopher Barron is a United States Army Officer who currently holds the billet of District Engineer for ACE covering the New England Region.

5. The Environmental Protection Agency ("EPA") is a civilian federal agency charged with diverse regulatory, permitting, and enforcement authority to enforce conservation laws like the Clean Water Act and the Clean Air Act.

6. The Massachusetts Department of Environmental Protection ("DEP") is an agency of the Commonwealth of Massachusetts. It primarily enforces state conservation laws, but additionally holds several federal permit including under the Clean Water Act. The DEP holds a delegation of authority which allows it to approve applications, under both federal and state law, within certain concrete guidelines laid out by the ACE.

7. Mr. Marco Tammaro is owner of the property which is the subject of this dispute, namely two parcels of land accessible at 15 Apple Hill Lane, Lynnfield.

**The Property**

8. Mr. Marco Tammaro ("the Developer") bought property from Mrs. Lee Sausele in 2013-2014.  The property consists of two parcels: one denominated 15 Apple Hill Lane and the other being 6R Cortland Road.  The Apple Hill parcel held the Sausele family home until the elderly Mrs. Sausele decided to give up the house and move to Virginia to be closer to one of her grown daughters.  The 6R Cortland Road parcel does not have road access and was taxed by the local assessors as unbuildable for years.  The Cortland Road property was treated as a wooded backyard for years.

9. The entire property abuts a conservation area owned by the Town of Lynnfield.

10. At the center of this litigation are two streams which run across the property.  At various times, government entities or the developer denied that the streams existed at all or variantly asserted that they were not protected "streams" within the meaning of the environmental laws.

11. The Front Stream, from Apple Hill Lane, ran across the Sausele property in a channel bounded by stones.  The bed of the stream was also populated with smooth wet stones, consistent with river stones and long submersion in water.  The stream is visible in aerial photography and in Sausele family photographs.  It has since been obliterated by Mr. Tammaro.

12. The Rear Stream runs across the width of the 6R Cortland Road parcel from Cortland down the sharp grade into the conservation area.  The Rear Stream runs from a small federally recognized wetland in the rear of 9 Cortland Road through a drainage easement across the street.

**Beaverdam Brook**

13. Both the Front Stream and Rear Stream run downhill across the property and into the conservation area. The conservation area's primary feature is the Beaverdam Brook.

14. The Beaverdam Brook is a water feature of ancient provenance and features on several colonial maps of Massachusetts. The Beaverdam brook is part of the Ispwich River watershed. The Beaverdam Brook is one of the waterflows into Reedy Meadow which, in turn, is the 8th largest freshwater cattail marsh in the United States. Reedy Meadow and its environs host the endangered King Rail birds

15. The flow from the Beaverdam Brook is part of the Ipswich River Watershed and runs into the Saugus River before running into the Atlantic Ocean.

16. The Beaverdam Brook runs across and influences the watershed from which the Lynnfield Center Water District (LCWD) draws the municipal drinking water from, through four wells into the local acquifer. LCWD has four wells, two artisian and two not.

17. The Beaverdam Brook flows into the Saugus river, which make up the reserve municipal water supply for the City of Lynn. The City of Lynn is a city of 90,000. The City of Lynn's water and sewer commission, although also taking part in MWRA, maintains a series of natural water draws and reservoirs, including Humphrey's Pond along Route 1 in Peabody and Lynnfield, and Hawes Pond along Walnut Street in Lynnfield. The City of Lynn also has a pumping station and sluiceway on the property of the former Colonial property, at the foot of Reed Meadow, which allows it to take water from the Saugus River.

18. The Beaverdam Brook is registered on several federal maps, including those produced by the EPA.  It has been catalogued and periodically monitored by the state and federal government under the auspices of Section 303 of the Clean Water Act.

19. The DEP has conducted period surveys of the Beaverdam Brook.  In surveys over the last two decades, the DEP has rated the Beaverdam Brook as contaminated and polluted, in a manner rendering it unsafe for many human uses.  It is not potable nor suitable for most recreational purposes.

20. The EPA has rated Beaverdam Brook as a Category 5 waterway and imposed limits the drawing of water from it.  Phrased another way, until the polluted status is abated, the water from Beaverdam Brook cannot safely be used or drawn above a certain level.

21. Beaverdam Brook is a water of the United States.

**The Developer Acts**

22. After buying the Sausele property in 2013-2014, Mr. Tammaro left the property vacant for some time.  Mold eventually grew in the existing house.  Accounts variantly state that the mold grew accidentally, or was deliberately invited in.  In either event, the mold served as cause to grant Mr. Tammaro local governmental permission to demolish the original Charles Wills designed colonial-style house which had existed there on an emergency basis.

23. In August 2015, Mrs. Rauseo and her Neighbors observed Mr. Tammaro start trucking fill onto the property.  This trucking continued unabated through September, October and November.  Mr. Tammaro admitted that the fill was imported onto the property in a letter to the local board of health.

24. Mrs. Rauseo and her neighbors have counted upwards of 100 large dump trucks of dirt. This is estimated to be more than 21,000 cubic yards of fill.

25. Mrs. Rauseo and her neighbors observed that the dump trucks did not carry fine and pristine loom, but rather dirt of visually dubious quality. Several of the dump trucks carrying fill **into** the property had construction debris, pieces of metal pipe, broken up concrete, and other non-native items.

26. Mr. Tammaro has denied that the amount of fill is that extensive, and maintains that it has been confined to three piles.

27. Notwithstanding his denials, the massive amount of fill substantially changed the landscape. The entire channel of the front stream has been buried. The grade of the property immediately behind the prior house has been raised 18 feet vertically.

28. Mrs. Rauseo complained to the DEP and the EPA and the local conservation commission that Mr. Tammaro was polluting the waters and illegally filling wetlands. No action resulted.

29. Eventually, Mrs. Rauseo got ahold of DEP's Elizabeth Sabounjian and Tim Dane with her insistent complaints about ongoing pollution. Mrs. Rauseo was advised to sit tight because a local review was about to take place, due to a forthcoming NOI. The pollution complaint was not acted upon.

30. Other neighbors also sought the intervention of the EPA and DEP. Their efforts were in vain.

31. After months of illegally filling, and months of complaints to every conceivable government agency, Mr. Tammaro finally filed his Notice of Intent (NOI) on December

12, 2015.  The NOI sought permission from DEP to perform a wide-scope of work,

including work that had already been done such as the demolition of the house.

32. The NOI was combined and filed contemporaneously with a submission to the local

Planning Board.  The Planning Board submission was seeking permission for a

subdevelopment, specifically a new street, which would allow Mr. Tammaro to build two

houses including one on the previously inaccessible 6R Cortland parcel.

33. After several months of contentious hearings, the local planning board and conservation

commission approved the plans as modified.

34. Mrs. Rauseo and her neighbors appealed the conservation decision to DEP.

35. DEP Northeast region conducted a site visit, though Mr. Wayne Lozzi, and issued its own

superseding order of conditions.

36. Mrs. Rauseo and her neighbors have appealed that decision to DEP's office of appeals

and dispute resolution.

37. Magistrate Timothy Jones issued a recommended decision which is adverse to the Apple

Hill neighbors.  The matter is now before the State Superior Court.

**The Government does not Act**

38. During the pendency of the local approvals, Mrs. Rauseo and her neighbors were

unhappy that their plaints were not listened too.  Their unhappiness was not in the sense

of disappointment by a defeated gladiator, but a frustration that not of the government

agencies involved could or would wrestle with their factual and legal contentions.  It is

one thing to be handed a loss with a statement of reasons and quite another to be simply

be summarily ruled against without any explanation.

39. Recognizing that no matter what, widespread neutral and even-handed Federal standards apply to all parties, Mrs. Rauseo made a vigorous effort to involve federal authorities.

40. Mrs. Rauseo wrote to Jacqueline LeClair of EPA Region 1 to make a complaint under Section 404 of the Clean Water Act that Mr. Tammaro was filling without permission and had filed his NOI belatedly.  An individual from Mrs. LeClair's office later called Mrs. Rauseo to inform her that the matter was being referred to the enforcement division based in Washington D.C.

41. Simultaneously, Mrs. Rauseo wrote to the Clean Water Division of the EPA in Washington D.C. beseeching the federal government to do something to protect the Beaverdam Brook and the two streams from the polluted fill that Mr. Tammaro had placed.  Her pleas fell on deaf ears.

42. Mrs. Rauseo also wrote to ACE but never heard back.

43. It subsequently emerged that Mrs. Christine Renzoni of the Army Corps of Engineers had written to Mr. Peter Ogren, the Developer's engineer, on July 1, 2016.  Mrs. Renzoni noted non-compliance with the wetland permitting scheme, and advised Mr. Ogren to filed the appropriate paperwork, depending on the size of the area and wetlands affected. Work below a certain threshold of size need not receive a separate permit if the developer files a self-verification affidavit.  Mrs. Renzoni's letter elegantly attempts to dispose of the permitting problems relating to the Section 404 violation.

44. Mr. Ogren wrote to Mrs. Renzoni on July 18, 2016, asserted his own independent legal conclusion that the development was exempt from the permitting requirements.  Mr. Ogren further claimed that the local approval fulfilled any federal requirements.  Mr. Ogren failed to act on either of the alternatives presented in Mrs. Renzoni's letter, either

filing a self-verification or separately applying for a permit.  In essence, Mr. Ogren's letter blew past any concern about wrong-doing and certainly declined to make any contrition or remedy.

45. Mrs. Rauseo, despite being the complaining party, was not notified of the Renzoni-Ogren exchange by either party.  She learned of the exchange through the local conservation administrator, who provided copies of the letters in relation of a viewing of public records.

46. Mr. Ogren's independent legal conclusion is erroneous.  Mr. Ogren also asserted matters that were factually untrue and irrelevant.

47. The Army Corps of Engineers allowed themselves to be blown off by the developer's engineer who did not comply with their demands and lied to them.

48. Months later, in October, 2016, Mrs. Rauseo wrote more letters to the New England Division of ACE.

49. The first letter was addressed to Colonel Barron as District Engineer.  While the letter noted the potential harms of Mr. Tammaro's illegal filling and the elimination of the wetlands, it primarily beseeched Colonel Barron to act on matters expressly within his jurisdiction.  The letter set out to conclusively prove that Mr. Tammaro's application did not fall within the confines of the NPDES general permit issued by ACE.  Mr. Tammaro also did not have a special permit from ACE.  Since Mr. Tammaro conceded the fact that he had been filling before he filed his NOI, the Engineer's regulations subjected him to more extensive remediation requirements for after-the-fact applications.  The District Engineer, Colonel Barron, is supposed to be satisfied with improves after imposing remediation requirements before **any** permit bearing federal approval may issue.

50. The second letter was addressed to the legal office of the Corps of Engineers New England Region.  This letter was exhaustive at pointing out how Mr. Tammaro had failed to comply with the federal permitting regime.  It primarily renewed the Clean Water Act Section 404 complaint, but also noted the still unaddressed pollution issues and the non-compliance with the NPDES general permit.

51. ACE apparently conducted a site visit of the property in November 2016.  Mr. Tammaro and his development team, including Mr. Ogren, were present.

52. Following the site visit, Mrs. Rauseo was learned that the visit had occurred from Ms. Betty Adelson, the local Environmental Administrator for the Lynnfield Conservation Commission.

53. Mrs. Rauseo was not allowed to participate in the ACE proceedings or even notified that they were occurring contemporaneously.

**Count I—APA Review—Unlawful Procedure**

54. As against ACE and Col. Barron, Mrs. Rauseo and her Group, make request for judicial review of the administrative conclusions about the Sausele property.

55. ACE and Colonel Barron violated the administrative procedure act.

56. Failing to allow Mrs. Rauseo to participate in the proceedings or to present her case was error.

57. That failure rendered the proceedings *ex parte*, particularly the site visit.

58. That failure also rendered the proceedings one-sided.  ACE and Colonel Barron were on notice that Mrs. Rauseo and her Group had a definite and stated interest in the outcome of the permitting/enforcement actions.  ACE and Colonel Barron could have easily invited

Mrs. Rauseo to participate, but they have **never** communicated directly with her.  This is true despite her initiative being the instigation for the proceedings.

59. Consonant with not allowing, or inviting, Mrs. Rauseo to participate, she was not allowed to present a case, challenge Mr. Tammaro's evidence, or otherwise be heard.

60. Essentially, no government agency has ever heard Mrs. Rauseo's case about the streams and the fill.  Mrs. Rauseo has been a neighbor to the property for more than 50 years and was a frequent visitor to her friend Lee Sausele's house.  She is a percipient witness.  She also has photographic, cartographic, and other evidence in support of her claims.  Some of her evidence directly impeaches Mr. Tammaro's claims, his evidence, and the competence and assertions of Mr. Ogren.

61. By making the proceedings one-side, ACE insulated from challenge all of Mr. Tammaro's evidence.

62. ACE and Colonel Barron also violated the fundamental tenets of due process, the right to be heard in a meaningful time and in a meaningful manner.  Mrs. Rauseo's communications with ACE have all been writings in the nature of initiating a complaint.  Mr. Tammaro was apparently allowed to meet the decision-maker in person, *ex parte*.  Mrs. Rauseo has not presented any of her evidence, but Mr. Tammaro was allowed to pointedly show his side of the story.

**Count II-APA-Substance**

63. ACE and Colonel Barron have made a decision against the weight of substantial evidence.

64. Mrs. Rauseo has no notice of the actual decision by ACE.  However the letter she obtained from a third party indicates that ACE has exonerated Mr. Tammaro.

65. Apparently ACE and Colonel Barron have determined that neither the Front Stream nor the Rear Stream are federally protected wetlands.  In doing so, they have concluded that there is no jurisdiction over the property.

66. Jurisdictional Determinations like this are reviewable final orders.

67. The current Waters of the United States Rule calls for a case-by-case determination.

68. Although ACE conducted a site visit, there is no indication that they reviewed and discarded important considerations, like the small marsh behind 9 Cortland Road.

69. There is no indication that ACE heard or reviewed any evidence about the polluted fill.

70. The site visit is necessarily poor evidence given the complete obliteration of the streams by Mr. Tammaro's illegally placed fill.

71. The site visit is also hampered from being effective evidence, occurring in the middle of the worst drought in Massachusetts in recorded history.

72. ACE did not apply a spoliation remedy.

73. ACE did not review or reason with any of Mrs. Rauseo's witness testimony or her historical evidence of water flow.  Historical evidence of water flow is perhaps the single most important form of evidence when dealing with intermittent streams like the front stream.

74. ACE also blindly accepted assertions by Mr. Tammaro's Engineer, Mr. Hayes, despite their facial flaws and falsity, which were challenged contemporaneously by Mrs. Rauseo in writing.

**Count III-*Ex Parte Contacts***

75. As against Mr. Tammaro, Colonel Barron, and ACE, there is evidence that Mr. Tammaro and his attorney had illegal *ex parte* contact with the administrative decision-makers who ruled on behalf of the federal government.

76. *Ex Parte* contacts are strictly regulated and normally forbidden.

77. In this case, the Army Corps of Engineers was prevailed upon, twice, by Mrs. Rauseo to act. She was apparently successful in inciting ACE to act.  However ACE did not inform her of proceeding or allow her to participate.

78. The most glaring example of *ex parte* contact is that ACE apparently held a site visit but did not allow Mrs. Rauseo to participate.  The letter that Mrs. Rauseo obtained disclosing the site visit indicates that the ACE decision makers met with, and discussed, the case with Mr. Tammaro, his attorney (believed to be John H. Kimball III) and his engineer, Mr. Peter Ogren of Hayes Engineering.

79. The point of prohibiting *ex parte* contacts is to allow each party a fair opportunity to press their case in an impartial forum without risk that the decision-maker will be influence by outside considerations.

80. This rule against *ex parte* contacts is also necessary to ensure an honest adversarial system will produce accurate results leading to truth.

81. Failure to uphold the rule against *ex parte* contacts leads to the potential bias of the decision-maker, a taint that the proceedings might be slanted, a likelihood that the decision will be based on evidence or factors not in the record, and an immunity for one side's assertions against the crucible of adversarial testing.

**Count IV—APA—Written Reasons of Decision**

82. ACE and Colonel Barron have failed to comply with the requirement with a written reasons of decision.

83. In both the initial round of written exchanges, over whether Messrs. Tammaro and Ogren must file, and the subsequent site visit, ACE did not produce written reasons of decision.

84. Mrs. Rasueo is not aware of any decision documents except for one letter, not given to her, which rules in Mr. Tammaro's favor.

85. The little reasoning given in the letter is not sufficient, within the meaning of the Administrative Procedures Act.  It does not explain why it rules for Mr. Tammaro, what evidence it accepts and credits, or the legal reasoning.

86. The decision, as such, also fails to provide notice of the right to appeal or seek judicial review.

**Count V-Sunshine Law**

87. Colonel Barron and ACE also failed to comply with the Sunshine Law.

88. In addition to not providing Mrs. Rauseo any notice of the site visit or proceedings, ACE failed to publicly notice the site visit and proceedings.

89. So far as Mrs. Rauseo is aware, there was no public notice posted.

90. The site visit, and proceedings, were not published in the Federal Register.

91. The entirety of proceedings was behind closed doors, not open or available to the Plaintiffs or the Public.

**Jurisdiction and Venue**

92.  The Federal District Court has subject matter jurisdiction over this case, with the causes of action arising under the APA and related statutes, thereby granting federal question jurisdiction.

93. The District of Massachusetts is a proper venue.  The subject property is located here.

    Mr. Tammaro lives here.  The Plaintiffs live here. The Army Corps of Engineers has an

    office in Massachuetts.

**Relief Sought**

94. The Plaintiffs primarily seek a remand to ACE for a full hearing in which they may

    participate, present a case, and receive the full benefits of Due Process.

95. Additionally the Plaintiffs seek a determination that ACE and the federal government

    have jurisdiction over the subject property.

96. The Plaintiffs seek equitable and declaratory relief relating to the illegal filling of

    wetlands, the destruction of the streams, and remediation for the unpermitted work.

97. Any other relief that the Court deems just and appropriate.


Respectfully Submitted,

Stephanie Rauseo and
The Apple Hill Neighbors Group
By their Attorney

Michael C. Walsh
BBO 681001
PO Box 9
Lynnfield, MA 01940
617-257-5496
Walsh.lynnfield@gmail.com